**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| ONE GEORGIA, INC., AFG GROUP INC d/b/a ABRAMS FOR GOVERNOR, and STACEY Y. ABRAMS, <br>　　　　　Plaintiffs, <br><br>　　v. <br><br>CHRISTOPHER M. CARR, in his official capacity as the Attorney General of Georgia; JAMES D. KREYENBUHL, in his official capacity as Chairman of the Georgia Government Transparency and Campaign Finance Commission; ERIC L. BARNUM, in his official capacity as Vice Chair of the Georgia Government Transparency and Campaign Finance Commission; DARRYL HICKS, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; RICK THOMPSON, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; ROBERT A. WATTS, in his official capacity as a Member of the Georgia Government Transparency and Campaign Finance Commission; and DAVID EMADI, in his official capacity as Executive Secretary of the Georgia Government Transparency and Campaign Finance Commission, <br>　　　　　Defendants. | CIVIL ACTION FILE NO. 1:22-CV-1130-MHC |

**BRIEF OF *AMICUS CURIAE* DGA IN SUPPORT OF PLAINTIFFS**

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

STATEMENT OF INTEREST ...............................................................................1

SUMMARY OF ARGUMENT ...............................................................................2

STATEMENT OF FACTS .......................................................................................5

ARGUMENT ...........................................................................................................8

    I.   Asymmetric contribution limits that deliberately favor the incumbent
        impose a grave constitutional harm. ............................................................8

    II.  Plaintiffs will suffer persistent, irreparable harm unless injunctive relief is
        immediately granted. ..................................................................................13

    III. Challengers do not pose a greater risk of corruption or its appearance than
        incumbents. ................................................................................................16

CONCLUSION ......................................................................................................19

CERTIFICATE OF COMPLIANCE .....................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Democratic Conf. v. Broussard,*
 541 F. App'x 931 (11th Cir. 2013) .................................................................. 8

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,*
 564 U.S. 721 (2011) ........................................................................................ 15

*Buckley v. Valeo,*
 424 U.S. 1 (1976) ..................................................................................... 8, 9, 16

*Cate v. Oldham,*
 707 F.2d 1176 (11th Cir. 1983) ...................................................................... 13

*Davis v. Fed. Election Comm'n,*
 554 U.S. 724 (2008) .................................................................................. 3, 9, 19

*Elrod v. Burns,*
 427 U.S. 347 (1976) ......................................................................................... 13

*Emison v. Catalano,*
 951 F. Supp. 714 (E.D. Tenn. 1996) ............................................................... 18

*McCutcheon v. Fed. Election Comm'n,*
 572 U.S. 185 (2014) ..................................................................................... 9, 16

*N.C. Right to Life, Inc. v. Bartlett,*
 3 F. Supp. 2d 675 (E.D.N.C. 1998), *aff'd in part, rev'd in part,* 168
 F.3d 705 (4th Cir. 1999) .................................................................................. 17

*Nixon v. Shrink Mo. Gov't PAC,*
 528 U.S. 377 (2000) (Breyer, J., concurring) ................................................... 9

*Ognibene v. Parkes,*
 671 F.3d 174 (2d Cir. 2011) ............................................................................ 18

*Randall v. Sorrell*,
548 U.S. 230 (2006)........................................................................10

*Shrink Mo. Gov't PAC v. Maupin*,
922 F. Supp. 1413 (E.D. Mo. 1996) ................................................17

**Statutes**

10 I.L.C.S. § 5/9-8.5(b)......................................................................11

Ak. Stat. § 15.13.070..........................................................................11

Hi. Rev. Stat. § 11-357........................................................................11

Ks. Stat. Ann. § 25-4153......................................................................11

Ky. Rev. Stat. § 121.150(6)..................................................................11

N.C. Gen. Stat. § 163-278.13(a) ...........................................................11

O.C.G.A. § 21-5-34.2............................................................................2

O.C.G.A. § 21-2-133(c).........................................................................7

O.C.G.A. § 21-5-34.2...................................................................*passim*

O.C.G.A. § 21-5-34.2(d).........................................................................6

O.C.G.A. § 21-5-34.2(e).........................................................................6

O.C.G.A. § 21-5-41.........................................................................12, 13

Pa. Stat. § 3253(a)...............................................................................11

Wis. Stat. § 11.1101(a) .........................................................................11

## INTRODUCTION

The Democratic Governors Association ("DGA") files this brief as *amicus curiae* in support of Plaintiffs One Georgia, Inc., AFG Group Inc. d/b/a Abrams for Governor and Stacey Y. Abrams, in their motion for temporary restraining order and preliminary injunction seeking emergency injunctive relief.

## STATEMENT OF INTEREST

*Amicus Curiae* DGA is an independent voluntary political organization that supports Democratic gubernatorial candidates across the United States, including in Georgia, by making monetary contributions, providing in-kind support, and funding independent expenditures.

For nearly 40 years, DGA has worked closely with Democratic gubernatorial candidates and their campaigns. Since the beginning of the 2014 election cycle, DGA has worked with 42 challengers seeking to unseat incumbent Republican governors; DGA has also worked with 20 incumbent Democratic governors fending off Republican challengers. Based on this experience, DGA understands how campaign finance laws can affect the ability of challenger candidates to raise sufficient funds to effectively challenge incumbents. DGA has also observed the singular importance of being able to raise funds early in an election cycle, so that challenger candidates have sufficient funds in time to make their case to voters and

defend against attacks from an incumbent governor as soon as the primary election concludes.

DGA plans to spend millions of dollars to elect Stacey Abrams as Georgia's governor. Shortly after the qualifying period concluded on March 11, DGA contributed $1 million to One Georgia, before One Georgia stopped accepting contributions. If this Court orders the requested relief, thereby removing the cloud of enforcement that currently hangs over Plaintiffs, DGA plans to make additional contributions to One Georgia before the May 24 primary. DGA has an interest in ensuring that Plaintiffs can accept unlimited campaign contributions *immediately* so that Plaintiffs have sufficient funds to promote their message and run a successful campaign on equal footing with Georgians First Leadership Committee and Governor Brian Kemp.

## SUMMARY OF ARGUMENT

O.C.G.A. § 21-5-34.2 allows one gubernatorial candidate (Governor Kemp) to accept unlimited contributions in support of his campaign but does *not* lift preexisting contribution limits (of $7,600 per election) on candidates, like Ms. Abrams, who seek to unseat him. No state other than Georgia affords the incumbent governor a more generous contribution limit than his challengers. Concluding that "the unprecedented step of imposing different contribution. . . limits on candidates

2

vying for the same seat is antithetical to the First Amendment," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 738, 744 (2008), this Court issued an order last month stopping Georgians First Leadership Committee from spending its funds in support of Governor Kemp's candidacy until the conclusion of the May 24 primary. Order, *Perdue v. Kemp*, No. 1:22-cv-00053-MHC (N.D. Ga. Feb. 7, 2022), ECF No. 58 (hereinafter "Perdue Order").

In issuing the order, this Court fixed the inequity that existed between Governor Kemp and his Republican challenger David Perdue. But the Court's order *permits* Governor Kemp to continue accepting unlimited contributions into Georgians First Leadership Committee from now until the May 24 primary. Those funds can be deliberately stockpiled, day after day, and then deployed against Ms. Abrams starting on May 25. Ms. Abrams, however, is barred from accepting contributions into *her* leadership committee until *after* the May 24 primary.

Ms. Abrams, therefore, faces a seventy-day period – from March 16, the date she attempted to register a leadership committee with the Georgia Government Transparency and Campaign Finance Commission ("Commission"), to May 24, the day of the primary – where she is subject to a contribution limit of $7,600 per election, but Governor Kemp is not. The restriction on Ms. Abrams – and the resulting inequity between her rights and those of Governor Kemp – violates the

First Amendment just as clearly as the prior inequity between Governor Kemp and Mr. Perdue. As this Court correctly observed last month, courts have never upheld a law that imposes asymmetric contribution limits on candidates seeking the same office. That the law deliberately favors the incumbent governor and disfavors his challengers deepens the constitutional wound.

This unconstitutional application of O.C.G.A. § 21-5-34.2 imposes significant, irreparable harm each day it remains in effect. And that harm extends *beyond* the seventy-day period when the asymmetric contribution limits are in place. As DGA knows from its own experience, early fundraising is vital to a candidate's eventual success. It enhances future fundraising capability and provides campaigns with greater flexibility in organizing and executing their programs. Amassing these funds now, before the primary, means that Ms. Abrams will have sufficient funds to communicate her message and counteract Governor Kemp's as soon as the general election campaign begins on May 25. Moreover, the accumulation of funds early in the cycle allows candidates to spend more time with voters as the election nears and as voters make their final decisions. Each day that this unconstitutional scheme remains in effect, Governor Kemp gains a competitive advantage that cannot be ameliorated.

There is no compelling state interest to justify a restriction on Ms. Abrams' ability to raise funds given Governor Kemp's statutory right to accept unlimited contributions. The notion that the state may restrict contributions to a challenger to guard against *quid pro quo* corruption or its appearance, but allow unlimited contributions to the incumbent, defies common sense and has no basis in the law.

As such, Plaintiffs' motion for temporary restraining order and preliminary injunction seeking emergency injunctive relief to enjoin the current application of O.C.G.A. § 21-5-34.2 should be granted.

## STATEMENT OF FACTS

In July of 2021, Governor Kemp signed Georgia Senate Bill 221, codified at O.C.G.A. § 21-5-34.2. The new law amended the Georgia Government Transparency and Campaign Finance Act (the "Act") to allow the Governor and "the nominee of a political party for Governor selected in a primary election" to establish a "leadership committee."

A leadership committee "[m]ay accept contributions or make expenditures for the purpose of affecting the outcome of any election or advocating for the election or defeat of any candidate, may defray ordinary and necessary expenses incurred in connection with any candidate's campaign for elective office, and may defray ordinary and necessary expenses incurred in connection with a public officer's

fulfillment or retention of such office." O.C.G.A. § 21-5-34.2(d). Existing contribution limits under the Act "shall not apply to contributions to a leadership committee or expenditures made by a leadership committee in support of a candidate or a group of named candidates." *Id.* § 21-5-34.2(e).

As this Court correctly observed, "O.C.G.A. § 21-5-34.2 effectively negates the contribution limit upon which all candidates for Governor in the primary election are bound for just one person: Governor Kemp, the incumbent." Perdue Order at 25. Unsurprisingly, on July 7, 2021, Governor Kemp registered Georgians First Leadership Committee with the Commission and began accepting unlimited contributions.

On January 6, 2022, a Republican candidate for Governor, former Senator David Perdue, filed a verified complaint and motion for emergency injunction. Mr. Perdue argued that O.C.G.A. § 21-5-34.2 violated his constitutional rights by allowing Governor Kemp to accept unlimited campaign contributions while not permitting Mr. Perdue to do the same. On February 7, 2022, this Court agreed with Mr. Perdue and enjoined Governor Kemp's leadership committee from spending funds through the end of the May 24 primary "for the purpose of advocating for the re-election of Governor Kemp or the defeat of an opponent of Governor Kemp" or "to defray ordinary and necessary expenses incurred in connection with Governor

6

Kemp's campaign for re-election." *Id.* at 38-39. The order did *not* bar Governor Kemp from continuing to accept unlimited contributions into his leadership committee.

On March 8, 2022, Ms. Abrams qualified to seek the Democratic Party's nomination for governor. The qualification period for candidates for the Democratic Primary election ended at noon on March 11, 2022. No other candidate qualified for the Democratic Party's nomination for governor. Write-in candidates are not eligible for candidacy in the general primary election in Georgia. O.C.G.A. § 21-2-133(c). While the Democratic primary is currently scheduled for May 24, 2022, Ms. Abrams has been acknowledged by the Democratic Party's chair as the "nominee." *See, e.g.,* Compl. at 2, *One Georgia, Inc. v. Carr,* No. 1:22-cv-01130-MHC (N.D. Ga. Mar. 21, 2022), ECF No. 1.

Shortly after the qualifying period concluded on March 11, Ms. Abrams established a leadership committee named One Georgia. Ms. Abrams serves as its Chair. On March 16, 2022, One Georgia attempted to register with the Commission as a leadership committee. Although One Georgia received an email confirming its registration, the Commission's general counsel subsequently advised that the Commission had not determined whether Ms. Abrams could permissibly chair a leadership committee before the May 24 primary. The Commission's general

counsel further advised that One Georgia could not raise funds until the Commission made that determination.

As of March 21, 2022, the Commission has yet to confirm whether One Georgia could operate as a leadership committee under § 21-5-34.2. Absent such confirmation, One Georgia is unable to accept contributions without fear of enforcement. Accordingly, on March 21, Plaintiffs filed a verified complaint with this Court, along with a motion for temporary restraining order and preliminary injunction seeking emergency injunctive relief from the continued inequitable and harmful application of O.C.G.A. § 21-5-34.2.

## ARGUMENT

### I. Asymmetric contribution limits that deliberately favor the incumbent impose a grave constitutional harm.

"It is well-established that political contributions are considered to be political speech, and protected by the First Amendment." *Ala. Democratic Conf. v. Broussard*, 541 F. App'x 931, 932-33 (11th Cir. 2013); *see also Buckley v. Valeo,* 424 U.S. 1, 14 (1976) ("The Act's contribution ... limitations operate in an area of the most fundamental First Amendment activities."). Therefore, *any* limits on contributions can only be sustained "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary

abridgement of associational freedoms." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 197 (2014) (quoting *Buckley*, 424 U.S. at 25) (internal citations omitted).

Contribution limits that prefer one type of candidate over the other are inherently suspect. *Davis*, 554 U.S. at 738, 742 ("[I]t is a dangerous business for [legislatures] to use the election laws to influence the voters' choices."). Significantly, the U.S. Supreme Court has "never upheld the constitutionality of a law that imposes different contribution limits for candidates competing against each other." *Id.* at 744. In striking down a law that awarded a higher contribution limit to candidates facing off against self-funding opponents, the U.S. Supreme Court opined that "the unprecedented step of imposing different contribution … limits on candidates vying for the same seat is antithetical to the First Amendment." *Id.*

Likewise, the U.S. Supreme Court has observed that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21. While courts generally defer to legislative judgments in this area, that is only "where that deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 402 (2000) (Breyer, J., concurring). Contribution limits that have the effect of favoring

9

incumbents are inherently suspect. *See Randall v. Sorrell*, 548 U.S. 230, 232 (2006) ("Contribution limits that are too low also can harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability.").

Incumbent governors already enjoy a significant electoral advantage. They have strong name recognition with their constituents, maintain a statewide platform to capture voter attention, wield executive authority, possess extensive fundraising capabilities and existing war chests from their previous elections, and benefit from successful campaign experience and a presumption of future success. *See, e.g.*, *Randall*, 548 U.S. at 256 ("[T]he typically higher costs that a challenger must bear to overcome the name-recognition advantage enjoyed by an incumbent, raise a reasonable inference that the contribution limits are so low that they may pose a significant obstacle to candidates in competitive elections."). Since the 2014 election cycle, 61 incumbent governors have been up for reelection and only nine have been defeated.[1] Challengers running in these elections had at least one thing on their side:

---

[1] Governors Corbett (Pennsylvania), McCrory (North Carolina), Rauner (Illinois), Quinn (Illinois), Walker (Wisconsin), Bevin (Kentucky), Parnell (Alaska), Colyer (Kansas), Abercrombie (Hawaii).

they enjoyed the same contribution limits as the incumbent.[2] The parity in contribution limits allowed the challengers to outspend the incumbents in these nine races by a 3 to 2 ratio in the aggregate.[3] Parity in contribution limits is the norm, not the exception. The only outlier is Georgia.

O.C.G.A. § 21-5-34.2, therefore, is the Frankenstein's monster of unconstitutional campaign finance laws: it assigns different contribution limits to

---

[2] *See, e.g.*, 25 Pa. Stat. § 3253(a); N.C. Gen. Stat. § 163-278.13(a); 10 I.L.C.S. § 5/9-8.5(b); Wis. Stat. § 11.1101(a); Ky. Rev. Stat. § 121.150(6); Ak. Stat. § 15.13.070; Hi. Rev. Stat. § 11-357; Ks. Stat. Ann. § 25-4153.

[3] *See* APOC Online Reports, Alaska Pub. Offices Comm'n, available at https://aws.state.ak.us/ApocReports/CampaignDisclosure/CDExpenditures.aspx (last visited Mar. 28, 2022); Thomas Fitzgerald, *At $82 million, Pennsylvania governor's race broke spending record,* Pittsburgh Post-Gazette (Dec. 6, 2014, 12:06 AM), https://www.post-gazette.com/news/politics-state/2014/12/05/Pennsylvania-governor-s-race-broke-spending-record-82-million/stories/201412050165; Expenditure List, Ill. State Bd. of Elections, available at (last visited Mar. 28, 2022); Receipts & Disbursements, (2014 Election), State of Haw. Campaign Spending Comm'n, available at https://ags.hawaii.gov/campaign/files/2015/01/2014governor.pdf (last visited Mar. 28, 2022); Expenditures of Cooper for M.C. & Pat McCrory Comm., N.C. State Bd. of Elections, available at https://cf.ncsbe.gov/CFTxnLkup/ (last visited Mar. 28, 2022); Greg Bishop, *Illinois' gubernatorial race sets national spending record* (Jan. 18, 2019), https://www.daily-journal.com/news/illinois/illinois-gubernatorial-race-sets-national-spending-record/article_0194a758-1b28-11e9-8eeb-bb27de60af4e.html; Press Release, Wis. Democracy Campaign, 2018 Governor's Race Cost Record $93M+ (Jan. 24, 2019), https://www.wisdc.org/news/press-releases/126-press-release-2019/6288-2018-governor-s-race-cost-record-93m; Campaign Fin. Viewer, Kan. Sec'y of State, available at https://kssos.org/elections/cfr_viewer/cfr_examiner_expenditure.aspx (last visited Mar. 28, 2022).

candidates running for the same office *and* deliberately favors incumbents and disadvantages challengers. For that reason, this Court correctly found that the statute, as applied, violated the First Amendment. The Perdue Order relieved the constitutional injury *suffered by Mr. Perdue*, by ensuring that Governor Kemp could only use funds subject to limits under O.C.G.A. § 21-5-41 during the primary campaign. But Governor Kemp may continue to *accept* unlimited contributions into his leadership committee between now and the May 24 primary. Those funds can be collected *now*, before the primary, and then deployed against Ms. Abrams as soon as the general election campaign begins on May 25.

The Commission's refusal to confirm that Ms. Abrams may chair a leadership committee before the May 24 primary creates a new asymmetry and a new constitutional harm: Ms. Abrams is "subject to a maximum contribution limit of $7,600 while Governor Kemp can raise unlimited contributions through his leadership committee, Georgians First." Perdue Order at 25. While O.C.G.A. § 21-5-34.2 does not directly restrict Ms. Abrams' speech, it "creates an uneven campaign finance scheme in which Governor Kemp, through Georgians First, can accept unlimited campaign contributions, effectively removing Governor Kemp from the statutory contribution limits imposed by O.C.G.A. § 21-5-41 on ... candidate[s] running for the same office." *Id.* at 24-25. The reasoning underlying this Court's

12

order in *Perdue v. Kemp* applies with equal force here. Just as Mr. Perdue suffered a constitutional injury by being forced to operate under the limits prescribed by O.C.G.A. § 21-5-41, while his opponent enjoyed the broader allowance afforded by O.C.G.A. § 21-5-34.2, Ms. Abrams suffers the same constitutional injury today.

## II. Plaintiffs will suffer persistent, irreparable harm unless injunctive relief is immediately granted.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983). Ms. Abrams' loss of First Amendment freedoms for the seventy-day period is sufficient, by itself, to merit injunctive relief.

But this case presents an even more compelling case for immediate relief. As DGA has observed, fundraising success early in an election cycle is critical to a challenger's prospects on election day. Accordingly, absent immediate judicial intervention, the harm caused by the loss of First Amendment freedoms during the seventy-day period will persist long *after* the seventy-day period ends. And there is no way to repair that harm.

The importance of early fundraising on a candidate's eventual success cannot be overstated. "Demonstrating the ability for fundraising early on is often regarded

as a prerequisite for a campaign to be seen as viable." Adam Bonica, *Professional Networks, Early Fundraising, and Electoral Success* Election L. J. (Dec. 28, 2016), at 2, *available online at* https://ssrn.com/abstract=2891145 (last visited Mar. 27, 2022).  This is the theory behind organizations like EMILY's list, which standards for "Early Money is Like Yeast": a "reference to the convention that successfully fundraising early in the race aids in attracting other donors later on." *Id.* at 12.

Indeed, early fundraising success enhances future fundraising opportunities. A study assessing the fundraising viability of candidates for the U.S. House of Representatives found that "[a] dollar of seed money help[ed] a challenger raise an additional two dollars later in the campaign." Robert Biersack, Paul S. Herrnson & Clyde Wilcox, *Seeds for Success: Early Money in Congressional Elections*, 18 Legis. Stud. Quarterly, 535, 542 (Nov. 1993), *available online at* https://doi.org/10.2307/439854 (last visited Mar. 27, 2022). The results of this study "confirm the conventional wisdom that 'early money is like yeast,' for seed money is associated with later fund-raising success even with controls for candidate quality, candidate experience in House elections, incumbent vulnerability, and party," with the same results "for repeat challengers even after controls for past fund-raising success, suggesting that the result is not an artifact of different abilities and inclinations to raise money." *Id.* at 548.

14

Further, "money available early in the campaign is put to much better use than money received later." Gary Jacobson & Jamie Carson, The Politics of Congressional Elections 103 (9th ed. 2015). "Early money is seed money for the entire campaign effort; it is needed to organize, plan, and raise more money." *Id.* Early fundraising "gives candidates maximum flexibility when making expenditures and leads to later fund-raising success." Janet Box-Steffensmeier, Peter Radcliffe & Brandon Bartels, *The Incidence and Timing of PAC Contributions to Incumbent U.S. House Members, 1993-94*, 30 Legis. Stud. Quarterly 549, 550 (2005), *available online at* https://polisci.osu.edu/sites/polisci.osu.edu/files/incidence.pdf (last visited Mar. 27, 2022). When the incumbent is allowed to stockpile funds and the challenger is denied the same opportunity, the challenger is vulnerable to unanswered attack ads during the period immediately following the primary. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 747 (2011) ("All else being equal, an advertisement supporting the election of a candidate that goes without a response is often more effective than an advertisement that is directly controverted.").

This harm cannot be repaired. Because election day is fixed, the time in an election campaign is finite; a candidate cannot recoup lost fundraising days later in a campaign. Each day that passes is one more day where Governor Kemp can press

15

his fundraising advantage over Ms. Abrams, making it that much harder for her to "amass[] the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21.

### III.   Challengers do not pose a greater risk of corruption or its appearance than incumbents.

The imposition of contribution limits is justified by only one state interest: preventing actual and apparent *quid pro quo* corruption. *Buckley*, 424 U.S. at 1; *see also McCutcheon*, 572 U.S. at 192. The State's argument that "transparency" is a sufficient argument to justify the imposition of different contribution limits for candidates running for the same office is simply incorrect under the law. To justify this "unprecedented" asymmetry in contribution limits, the State must somehow show that limiting contributions *to challengers but not incumbents* prevents actual and apparent *quid pro quo* corruption.

Such an argument defies logic and common sense. *See Buckley*, 424 U.S. at 33 ("Since the danger of corruption and the appearance of corruption *apply with equal force to challengers and to incumbents*, Congress had ample justification for imposing the same fundraising constraints upon both." (emphasis added)). As an association comprised of incumbent Democratic governors, DGA is keenly aware of the authority that governors wield. Sitting governors can approve or veto legislation; issue executive orders; and, in some cases, award contracts. Sitting governors enjoy

16

that power *today*; challengers must win an upcoming election, an uncertain proposition, before they can exercise this authority.

Since *Buckley*, courts have generally concluded that incumbents are *more* at risk of corruption than challengers. In 1996, a Missouri court struck down a statute prohibiting candidates and officeholders from accepting campaign contributions during the regular session of the general assembly, concluding that the statute "is not narrowly tailored" because it

> applies to all officeseekers, incumbents and non-incumbents alike. If its purpose is to curtail corruption or the appearance of corruption by eliminating financial quid pro quo contributions, the Court is hard-pressed to understand how this goal can be accomplished by applying the prohibition to non-incumbent candidates or even some public officials who are not subject to such a corrupting arrangement. For example, plaintiffs Schock and Dreste presently are not in public office or in a position to cast a legislative vote in exchange for campaign contributions. What possible corrupting influence or arrangement can be prevented by prohibiting campaign contributions to persons with no power to interfere with the integrity of the legislative process?

*Shrink Mo. Gov't PAC v. Maupin*, 922 F. Supp. 1413, 1422 (E.D. Mo. 1996). Other courts agree that a "statute seeking to avoid corruption or the appearance of corruption in the State legislature does not advance those purposes by limiting the fundraising of non-incumbent candidates for office." *N.C. Right to Life, Inc. v. Bartlett*, 3 F. Supp. 2d 675, 681 (E.D.N.C. 1998), *aff'd in part, rev'd in part,* 168

F.3d 705 (4th Cir. 1999); *see also Emison v. Catalano*, 951 F. Supp. 714, 722–23 (E.D. Tenn. 1996) ("[A]lthough inspired by the commendable impulse to eliminate corruption and the appearance of corruption in political life, [a law that prevents a General Assembly candidate, whether an incumbent or nonincumbent, from soliciting or accepting campaign contributions during the legislative session] cannot constitutionally be applied to contributions to nonincumbent candidates for seats in the legislature."); *Ognibene v. Parkes*, 671 F.3d 174, 179 (2d Cir. 2011) (finding that incumbent candidates in New York City were more likely to receive large donations from individuals and entities doing business with the City than challengers because incumbents were considered to have greater influence on City decisions).

There is no basis to treat a challenger as more at risk of corruption than an incumbent. Once a legislature decides that no contribution limit is necessary to prevent actual or apparent *quid pro quo* corruption with respect to a particular office, as the Georgia legislature did with respect to the governor when it enacted O.C.G.A. § 21-5-34.2, contribution limits must fall for *all candidates for that office.* As the U.S. Supreme Court observed:

> There is, however, no constitutional basis for attacking contribution limits on the ground that they are too high. [A legislature] has no constitutional obligation to limit contributions at all; and if [a legislature] concludes that allowing contributions of a certain amount does not create an

18

> undue risk of corruption or the appearance of corruption, a candidate who wishes to restrict an opponent's fundraising cannot argue that the Constitution demands that contributions be regulated more strictly.

*Davis*, 554 U.S. at 737. The Georgia legislature had the constitutional authority to determine whether the risk of corruption or its appearance justified contribution limits on *all candidates running for governor*. But once it decided that "those limits are not needed in order to combat corruption, then the obvious remedy is to raise or eliminate those limits" *for all candidates. Id.* at 743. No other remedy addresses the constitutional harm caused by O.C.G.A. § 21-5-34.2.

## CONCLUSION

For the foregoing reasons, and to prevent any further disadvantage to Plaintiffs, Plaintiffs' motion for temporary restraining order and preliminary injunction seeking emergency injunctive relief should be granted.

Respectfully submitted, this 28th day of March 2022.

/s/ Von A. DuBose
Von A. DuBose
Georgia Bar No. 231451
Dubose Miller
75 14th Street NE, Suite 2110
Atlanta, GA 30309
Telephone: (404) 720-8111
Facsimile: (404) 921-9557
dubose@dubosemiller.com

Jonathan Berkon*
Courtney Weisman*
Sarah Mahmood*
Francesca Gibson*
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, DC 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
jberkon@elias.law
cweisman@elias.law
smahmood@elias.law
fgibson@elias.law

*Pro Hac Vice Forthcoming*

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, I hereby certify that this brief has been prepared in Times New Roman, 14-point font, one of the point and font selections approved by the Court in Local Rule 5.1(C).

Respectfully submitted this 28th day of March, 2022.

/s/ Von A. DuBose
Von A. DuBose
Georgia Bar No. 231451

*Counsel for Amicus Curiae*

20