IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ONE GEORGIA, INC.; AFG
GROUP INC. d/b/a Abrams for
Governor; and STACEY Y.
ABRAMS,

     Plaintiffs,

v.

CHRISTOPHER M. CARR, in his
official capacity as the Attorney
General of Georgia; JAMES D.
KREYENBUHL, in his official
capacity as Chairman of the Georgia
Government Transparency and
Campaign Finance Commission;
ERIC L. BARNUM, in his official
capacity as Vice Chair of the Georgia
Government Transparency and
Campaign Finance Commissions;
ROBERT A. WATTS, in his official
capacity as a Member of the Georgia
Government Transparency and
Campaign Finance Commission;
DARRYL HICKS, in his official
capacity as a Member of the Georgia
Government Transparency and
Campaign Finance Commission.
RICK THOMPSON, capacity as a
Member of the Georgia Government
Transparency and Campaign
Finance Commission; and DAVID

CIVIL ACTION FILE

NO. 1:22-CV-1130-MHC

**EMADI, in his official capacity as
Executive Secretary of the Georgia
Transparency and Campaign
Finance Commission,**

   **Defendants.**

## ORDER

This case comes before the Court on Plaintiffs' Motion for Preliminary

Injunction[1] ("Pls.' Mot.") [Doc. 9] and Defendants' Motion for an Order to Certify

a Question of Law to the Supreme Court of Georgia ("Defs.' Mot.") [Doc. 33].

## I.    BACKGROUND

### A.    The Law Authorizing the Creation of Leadership Committees

On July 1, 2021, a state law became effective which provided a new

mechanism by which certain Georgia public office holders may obtain

contributions for elective office.  Ga. Laws 2021, Act 219, § 1, eff. July 1, 2021.

The new law, codified at O.C.G.A. § 21-5-34.2 (the "LC Statute"), provides, in

pertinent part, that "[a] leadership committee may accept contributions or make

---

[1] The Court previously denied Plaintiffs' motion for an ex parte temporary
restraining order, and deferred ruling on Plaintiffs' motion for temporary
restraining order and preliminary injunction until Defendants were served and
responded.  Mar. 21, 2022, Order [Doc. 10].  Now that all Defendants have waived
service and filed briefs in response to Plaintiffs' motion, and the Court has held a
hearing at which all parties appeared, Plaintiffs' motion for temporary restraining
order [Doc. 9] is **DENIED AS MOOT**.

expenditures for the purpose of affecting the outcome of any election or advocating for the election or defeat of any candidate . . . ." O.C.G.A. § 21-5-34.2(d). A "leadership committee" is defined as follows:

> [A] committee, corporation, or organization chaired by the Governor, the Lieutenant Governor, the nominee of a political party for Governor selected in a primary election in the year in which he or she is nominated, or the nominee of a political party for Lieutenant Governor selected in a primary election in the year in which he or she is nominated. Such term shall also mean up to two political action committees designated by the majority caucus of the House of Representatives, the minority caucus of the House of Representatives, the majority caucus of the Senate, and the minority caucus of the Senate. No person may chair more than one leadership committee.

O.C.G.A. § 21-5-34.2(a).

A leadership committee may begin to accept contributions prior to being registered as such, but must register with the Georgia Government Transparency and Campaign Finance Commission (the "Commission") within ten days of beginning to accept contributions and must disclose contributions or expenditures in excess of $500.00:

> A leadership committee which accepts contributions or makes expenditures in excess of $500.00 shall register with the commission within ten days of such accepted contribution or such expenditure and, thereafter, shall file disclosure reports pursuant to the schedule defined for candidates and campaign committees in subsection (c) of Code Section 21-5-34. Such disclosure reports shall be made pursuant to subsection (b) of Code Section 21-5-34.

O.C.G.A. § 21-5-34.2(e).  A key component of the LC Statute is that "[t]he contribution limits in Code Section 21-5-41 shall not apply to contributions to a leadership committee or expenditures made by a leadership committee in support of a candidate or a group of named candidates," meaning that a leadership committee may accept contributions in any amount and is not bound by the current monetary limitation of $7,600 imposed upon candidates for statewide office and their campaign committees.[2]

---

[2] Candidates for statewide office and their campaign committees are limited in the amount of contributions they may obtain from an individual contributor.  Although the maximum allowable contribution in the last amendment affecting the statutory contribution limits was $5,000 for a primary election and $3,000 for a primary runoff election, Ga. Laws 2000, p. 1491 (eff. Jan. 1, 2001), codified at O.C.G.A. § 21-5-41(a)(1) & (2), "the contribution limitations in this Code section shall be raised or lowered in increments of $100.00 by regulation of the commission pursuant to a determination by the commission of inflation or deflation during such cycle or four-year period, as determined by the Consumer Price Index published by the Bureau of Labor Statistics of the United States Department of Labor, and such limitations shall apply until next revised by the commission."  O.C.G.A. § 21-5-41(k).  The current contribution limits for candidates for statewide elected office are $7,600 for a primary or general election and $4,500 for a primary or general runoff election.  See GEORGIA GOVERNMENT TRANSPARENCY & CAMPAIGN FINANCE COMMISSION, www.ethics.ga.gov/contribution-limits (last visited Apr. 11, 2022).

**B.**     **Perdue v. Kemp**

On July 8, 2021, Georgians First Leadership Committee, Inc. ("Georgians First") was established with Governor Brian Kemp as its chairperson. Perdue v. Kemp, 1:22-CV-0053-MHC, 2022 WL 710959, at *3 (N.D. Ga. Feb. 7, 2022).   On December 6, 2021, former United States Senator David Perdue ("Perdue") announced his intent to run for Governor of Georgia. Id.  One month later, Perdue filed a complaint challenging the constitutionality of the LC Statute because it permitted Governor Kemp, as the sitting Governor, to raise and spend unlimited funds through Georgians First in the Republican Party primary election for Governor while Perdue could raise only a maximum of $7,600 from an individual contributor for the same primary election.  Id.

On February 7, 2022, this Court found that Perdue was likely to succeed on the merits of his claim that the LC Statute violated his rights under the First Amendment because (1) the LC Statute effectively negated the contribution limit imposed upon all candidates for Governor in the primary election for just one candidate, Governor Kemp, through his leadership committee, Georgians First, (2) the State failed to demonstrate a sufficiently important state interest to support such a distinction, and (3) the statute was not closely drawn to serve any such purported interest.  Id. at *8-13.  The Court preliminarily enjoined Georgians First

from expending funds beginning on the date of this Order (1) for the purpose of advocating for the re-election of Governor Kemp or the defeat of an opponent of Governor Kemp through the 2022 primary election and 2022 primary runoff election, if any there be, or (2) to defray ordinary and necessary expenses incurred in connection with Governor Kemp's campaign for re-election as Governor of Georgia though the 2022 primary election and 2022 primary runoff election, if any there be, until further Order of this Court.

Id. at *14.  The injunction did not prevent Georgians First from continuing to receive funds and make expenditures "in support of public officials other than Governor Kemp" nor make unlawful any expenditures made prior to the Court's Order to promote Governor Kemp's re-election or the defeat of an opponent of Governor Kemp.  Id.

### C.    One Georgia

One Georgia, Inc. ("One Georgia") is a leadership committee chaired by Stacey Y. Abrams ("Abrams"), who has qualified to run in the Democratic Party primary election for Governor of Georgia.  Verified Compl. ("Compl.") [Doc. 1] ¶¶ 13, 15, 46.  One Georgia began accepting contributions following the end of the qualifying period for the primary election for Governor on March 11, 2022.  Id. ¶ 51.  Abrams was the only candidate to qualify for the Democratic Party's primary election for Governor of Georgia.  Id. ¶ 47; Aff. of Nikema Williams (Mar. 15, 2022) [Doc. 1-2] ¶ 7.  On March 16, 2022, One Georgia electronically submitted

its registration form through the Commission's online portal. Id. ¶ 52. One

Georgia received an email confirming that its registration had been processed and

approved by the Commission. Id. ¶ 53.

However, that same day, One Georgia sought confirmation from Robert

Lane ("Lane"), Deputy Executive Director and General Counsel of the

Commission, "that approval of One Georgia's registration as a leadership

committee constituted acceptance of One Georgia's lawful status as a leadership

committee under the LC Statute." Id. ¶ 54. Following a phone conversation

between Lane and One Georgia's counsel, One Georgia sent Lane an affidavit

from the Chair of the Democratic Party of Georgia, Nikema Williams, "stating the

party's position that Ms. Abrams is the party's nominee for Governor." Email

from Adam M. Sparks to Robert Lane (Mar. 16, 2022 at 3:00 PM) [Doc. 1-3 at 12-

13]. Lane responded back as follows:

> The Commission acknowledges receipt of Ms. Williams' affidavit. We
> are currently working with the Secretary of State's Office and the
> Department of Law to see if the affidavit is legally sufficient to declare
> Ms. Abrams the DPG's official nominee. As soon as I have an official
> response, I will circle back. Until then, as we discussed earlier, Ms.
> Abrams' leadership committee One Georgia is not officially approved
> to commence fundraising pursuant to O.C.G.A. § 21-5-34.2(a).

Email from Robert Lane to Adam M. Sparks (Mar. 16, 2022 at 4:22 PM) [Doc. 1-3

at 12].

After receiving no further communication by the next morning, One Georgia asked Lane for the status of his response, Email from Adam M. Sparks to Robert Lane (Mar. 17, 2022 at 10:31 AM) [Doc. 1-3 at 11], and Lane indicated that he was trying to get an answer "as soon as practicable" but added, in part:

> [T]he Commission is not the arbiter of when a person is declared a candidate, nominee or public officer; for that determination, we must defer to others.   Once I have that legal opinion, I will be able to communicate it promptly . . . .
>
> That being said, the Commission's position has always been crystal clear and communicated to your client via several avenues, including in person to her campaign manager, that until there was an official nomination to stand for election, your client would not be able to commence fundraising under the provisions of O.C.G.A. § 21-5-34.2.

Email from Robert Lane to Adam M. Sparks (Mar. 17, 2022 at 12:59 AM) [Doc. 1-3 at 4].  Lane next advised One Georgia's attorney that the response from the Secretary of State's office should come on March 18, 2022, Email from Robert Lane to Adam M. Sparks (Mar. 18, 2022 at 12:41 PM) [Doc. 1-3 at 8], and then revised that prediction to a later date of Monday, March 21, 2022, Email from Robert Land to Adam M. Sparks (Mar. 18, 2022 at 5:33 PM) [Doc. 1-3 at 1]. Plaintiffs then filed their lawsuit on March 21, 2022.  Compl.

### D.    The Complaint

Plaintiffs brought the above-styled lawsuit challenging the constitutionality of the LC Statute which they contend is "antithetical to the First Amendment."

Compl. ¶ 10.  Plaintiffs contend that the "LC Statute as applied . . . violates

Plaintiffs' constitutional rights of speech and association."  Id. ¶¶ 12, 75.

Specifically, they allege that, as applied, the LC Statute "has the purpose and effect

of quieting core political speech of any other challenger to the incumbent governor,

including a qualified, declared candidate for governor who has been declared the

nominee of an adverse political party."  Id. ¶ 9.  Plaintiffs question the legitimacy

of any state interest furthered by the statute and argue that "[e]ven if the LC Statute

were supported by a sufficiently important interest, the statute is not closely drawn

to achieve any legitimate interest."  Id. ¶¶ 10-11, 73-74.  The Complaint asks this

Court to declare the LC Statute violative of the First and Fourteenth Amendments

as applied to One Georgia.  Id., Prayer for Relief ¶ A.

The Complaint alleges that, "[d]ue to the credible threat of enforcement

proceedings and the uncertainty wrought by the Commission['s] conduct, One

Georgia has not spent any funds in its possession, whether in support of Ms.

Abrams or any other candidate, pending Commission confirmation of its current

lawful status as a leadership committee under the LC Statute."  Id. ¶ 56; see also

¶ 58 ("Plaintiffs anticipate an imminent, credible threat that Defendants will

institute investigatory and enforcement proceedings and issue sanctions against

them under the LC Statute and the Act based upon the Commission's refusal to

confirm One Georgia's current lawful status as a leadership committee.").

Plaintiffs allege that Georgians First, Governor Kemp's leadership committee, has

been permitted to raise unlimited contributions to benefit his candidacy for

Governor and will be allowed to do so until the conclusion of the Republican Party

primary election. Id. ¶ 57.

Because of One Georgia's inability to raise unlimited contributions between

now and the date of the Democratic Party primary election, Plaintiffs argue that

they are suffering imminent and irreparable injury, and in Count I of their

Complaint seek a declaration from this Court that One Georgia can accept

additional funds without facing penalties from the Commission.  Id. ¶¶ 62-65.

Plaintiffs also assert in Count II of the Complaint that the current application of the

LC Statute by the Commission violates the First and Fourteenth Amendments by

authorizing only the leadership committee chaired by Governor Kemp to accept

unlimited contributions while preventing Abrams from doing the same.  Id. ¶¶ 67-

76.  For similar reasons, Plaintiffs allege in Count III that the Commission is

violating Abrams's equal protection rights under the Fourteenth Amendment.  Id.

¶¶ 78-86.

However, rather than seek to have this Court restrict Governor Kemp's

ability to continue to raise unlimited contributions through Georgians First until

and unless he is selected in the primary election as the Republican Party's nominee for Governor, Plaintiffs instead seek to have this Court immunize One Georgia from administrative action by the Commission if One Georgia continues to raise funds as Abrams's leadership committee prior to the primary election. Indeed, Plaintiffs seek to have this Court preliminarily enjoin Defendants "from engaging in investigatory or enforcement proceedings or sanctioning Plaintiffs for alleged violation of the LC Statute" by operating One Georgia as a leadership committee. Pls.' Mot. at 25.

## II.   STANDING

Defendants contend that Plaintiffs lack standing to bring their Complaint against them. Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. ("Defs.' Opp'n") [Doc. 32] at 9-16. Article III of the United States Constitution expressly limits federal jurisdiction to "cases and controversies" and does not permit federal courts to issue advisory opinions. Miller v. F.C.C., 66 F.3d 1140, 1145 (11th Cir. 1995) (citing Flast v. Cohen, 392 U.S. 83, 94-96 (1968)). "To have a case or controversy, a litigant must establish that he [or she] has standing," United States v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019), which requires the litigant to show (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. Lujan v. Defs. of Wildlife, 504 U.S.

555, 560-61 (1992).  The three components form an "irreducible constitutional minimum."  Id. at 560.  "The party invoking federal jurisdiction bears the burden of establishing these elements," which, at the initial pleading stage, may be established based on "general factual allegations of injury."  Id. at 561.

Defendants argue that Plaintiffs fail to demonstrate both traceability and redressability, because neither the Attorney General nor the Commission members are given the statutory authority to declare Abrams the Democratic Party nominee for Governor.  Defs.' Opp'n at 9.   Plaintiffs contend that Defendants "clearly have power and responsibility to enforce what Plaintiffs allege and show are unconstitutional applications of the LC Statute."  Pls.' Combined Br. in Opp'n to Defs.' Mot. and Reply in Supp. of Pls.' Mot. ("Pls.' Combined Br.") [Doc. 34] at 2.

### A.    Injury in Fact

In order to suffer an "injury in fact," (1) the injury "must be an invasion of a legally protected interest that is sufficiently concrete and particularized rather than abstract and indefinite," (2) "there must be a causal connection between the injury and the challenged action of the defendant that is not too attenuated," and (3) "it must be likely rather than speculative that the injury will be redressed by a favorable decision."  Ga. State Conf. of NAACP Branches v. Cox, 183 F.3d 1259,

1262 (11th Cir. 1999) (citations and punctuation omitted).  Plaintiffs contend that

they are harmed in a concrete and particularized way because the failure of the

Commission to make a determination as to whether One Georgia may now operate

as a leadership committee causes actual and imminent harm when, at the same

time, Governor Kemp's leadership committee may continue to solicit contributions

even though he is not yet the Republican Party's nominee for Governor.  Pls.'

Combined Br. at 2-5.  Defendants do not contend that Plaintiffs fail to show an

injury in fact.  See Defs.' Opp'n at 9-17.

The Court agrees with Plaintiffs that they have alleged an injury in fact.  In

Davis v. Fed. Election Comm'n, 554 U.S. 724, 729 (2008), the Supreme Court

considered a challenge to a federal statute providing that when a self-financing

candidate expends more than $350,000 in personal funds, a competing candidate

may raise three times the normal limit on contributions from individual donors.

The Supreme Court found that the unequal treatment afforded by the statute was an

injury sufficient to confer standing to a self-funded candidate to file a First

Amendment challenge:

> Section 319(a) would shortly burden his expenditure of personal funds
> by allowing his opponent to receive contributions on more favorable
> terms, and there was no indication that his opponent would forgo that
> opportunity.  Indeed, the record at summary judgment indicated that
> most candidates who had the opportunity to receive expanded
> contributions had done so.  In these circumstances, we conclude that

> Davis faced the requisite injury from § 319(a) when he filed suit and has standing to challenge that provision's asymmetrical contribution scheme.

Id., 554 U.S. at 734-35.

Similarly, in this case, Abrams, through One Georgia, is unable to receive unlimited contributions in the same manner as Governor Kemp, through Georgians First, even though they are both running for the same office, because of the inequitable scheme which permits Governor Kemp to raise funds not subject to the individual contribution limits established by O.C.G.A. § 21-5-41(a), while Abrams remains subject to those limits until she is able to form a leadership committee as the nominee of the Democratic Party of Georgia. The Court finds that Plaintiffs have alleged an injury in fact based on the unequal campaign finance scheme established by O.C.G.A. § 21-5-34.2.

## B.    Traceability

"To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.'" Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting Lujan, 504 U.S. at 560). Although the Commission has the ability to institute enforcement proceedings for violations of the LC Statute, Defendants argue that the

14

Commission is not in the position to do so "[u]ntil an appropriate authority advised the Commission as to the legality of Plaintiffs' claim to be the nominee prior to the [primary] election." Defs.' Opp'n at 12. Defendants also argue that, even if One Georgia acts "prematurely in its operations," that "would not be expected to result in an investigation or enforcement action" by the Commission. Id. at 13.

Although Defendants minimize the possibility of the Commission taking punitive action against One Georgia, the communications between the Commission and One Georgia suggest otherwise. On two separate occasions, Robert Lane, the Commission's Deputy Executive Director and General Counsel, advised One Georgia that it would not be able to commence fundraising under the LC Statute because Abrams has not yet stood for election in the primary even though One Georgia had registered online. Email from Robert Lane to Adam M. Sparks (Mar. 16, 2022 at 4:22 PM); Email from Robert Lane to Adam M. Sparks (Mar. 17, 2022 at 12:59 AM).

"A person can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." Wollschlaeger v. Governor, Fla., 848 F.3d 1293, 1304 (11th Cir. 2017) (alterations accepted; citations omitted). In the First Amendment context, "plaintiffs do not

15

have to expose themselves to enforcement in order to challenge a law. . . .  Rather,

an actual injury can exist when the plaintiff is chilled from exercising her right to

free expression or forgoes expression in order to avoid enforcement

consequences."  Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998)

(citations omitted).  In this case, Plaintiffs need not wait until the Commission

determines whether it will take action to enforce the provisions of the LC Statute in

order to challenge the application of the LC Statute against them.

### C.     Redressability

Finally, Defendants contend that Plaintiffs' alleged injuries are not

redressable by an injunction against Defendants.  Defs.' Opp'n at 14-16.  Plaintiffs

must prove that there is a substantial likelihood that their injuries would be

redressed by a favorable decision on the merits.  See Clapper v. Amnesty Int'l,

USA, 568 U.S. 398, 410-14 (2013) (holding that it must be likely, not merely

speculative, that the injury will be redressed by a favorable decision).  Relief that

prevents or deters violations from reoccurring satisfies the redressability

requirement.  Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528

U.S. 167, 185 (2000).  However, "standing is not dispensed in gross," as "a

plaintiff must demonstrate standing for each claim he seeks to press and for each

form of relief that is sought."  Davis, 554 U.S. at 734 (internal punctuation and

citations omitted); see also Friends of the Earth, 528 U.S. at 185 ("[A] plaintiff must demonstrate standing separately for each form of relief sought.").

Plaintiffs' Motion requests an order preliminarily enjoining "enforcement of the LC Statute." Pls.' Mot. at 25. Specifically, Plaintiffs seek to

> enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from engaging in investigatory or enforcement proceedings or sanctioning Plaintiffs for alleged violation of the LC Statute or the Act by registering, operating, chairing, controlling, or otherwise using One Georgia as a leadership committee under the terms of the LC Statute prior to the certification of results of the primary election in the 2022 election cycle.

Id.; Compl., Prayer for Relief, ¶ C. Plaintiffs' alleged injury is that O.C.G.A. § 21-5-34.2 creates an inequitable and unconstitutional campaign finance scheme which permits Governor Kemp to raise funds as Governor through his leadership committee and avoid the individual contribution limits established by O.C.G.A. § 21-5-41(a), while Abrams remains subject to those contribution limits until the May 24, 2022, primary election. Defendants' position is that Plaintiffs cannot yet raise funds pursuant to the LC Statute because Abrams has not yet been selected as the nominee for the Democratic party "in a primary election." See O.C.G.A. § 21-5-34.2(d); see also O.C.G.A. § 21-2-151(a) ("A political party shall nominate its candidates for public office in a primary.").

The Commission's direction to One Georgia that it should not begin fundraising is based on a provision of Georgia law that is not challenged in this case; namely, that a political party "shall nominate its candidates for public office in a primary." O.C.G.A. § 21-2-151(a). In seeking to have the Court enjoin the Commission from enforcing the plain language of Georgia law, Plaintiffs seek relief that fails to address the purported unconstitutionality of the LC Statute. Rather than address the alleged unconstitutional inequity created by the application of the LC Statute whereby Governor Kemp is able to raise unlimited funds through his leadership committee during a time period when Abrams is not permitted to do the same, the injunctive relief currently sought by Plaintiffs would require this Court to find Abrams already is the Democratic Party nominee for Governor despite the fact that the primary election does not take place until May 24, 2022. Instead, Plaintiffs effectively seek to have this Court re-write the Georgia Election Code, § 21-2-1 et seq., and the Georgia Government Transparency and Campaign Finance Act, O.C.G.A. § 21-5-1 et seq., as it relates to when a candidate is recognized as the nominee of a political party.[3]

---

[3] The relief Plaintiffs seek would require this Court to re-write O.C.G.A. § 21-2-151(a) to provide that a political party shall nominate its candidates for public office in a primary, unless only one candidate qualifies for the primary, in which case that candidate becomes the nominee upon qualifying without having to be chosen in the primary. The Court would also have to re-write the LC Statute to

An injunction to prevent the Commission from undertaking any enforcement action against One Georgia would do nothing to address Plaintiffs' allegations that the LC Statute unfairly allows Georgians First to raise unlimited contributions on behalf of Governor Kemp based solely on his status as Governor, and prior to his becoming the Republican Party nominee.  The requested injunction also fails to address Plaintiffs' assertions that the LC Statute does not have "any demonstrated sufficiently important governmental interest" and that it "is not closely drawn to serve any sufficiently important State interest."  See Compl. ¶¶ 73-74. Consequently, the issuance of an injunction to prohibit the Commission from engaging in investigatory or enforcement proceedings against One Georgia would not redress the alleged unconstitutionality of the LC Statute.  Because the redressability requirement is not satisfied, Plaintiffs lack standing to seek the requested injunctive relief.  Nevertheless, assuming that Plaintiffs have established standing, the Court will proceed to consider whether it should grant Defendants' motion for an order to certify a question of law to the Supreme Court of Georgia

---

conform the definition of "leadership committee" to include an entity chaired not only by "the nominee of a political party for Governor selected in a primary election in the year in which he or she is nominated," but also include the possibility that a leadership committee can be formed and chaired by the political party's candidate when only one candidate qualifies for the primary at such time the political party officially declares that candidate the party's nominee.

and whether Plaintiffs otherwise satisfy the prerequisites for the issuance of a
preliminary injunction.

## III.   DEFENDANTS' MOTION FOR AN ORDER TO CERTIFY A QUESTION OF LAW TO THE SUPEREME COURT OF GEORGIA

In the event this Court found that Plaintiffs have standing to bring their
Complaint, Defendants have moved for this Court to certify to the Supreme Court
of Georgia the question of whether the LC Statute "permits the sole qualified
candidate seeking a party's gubernatorial nomination to have a leadership
committee prior to the primary election date." Defs.' Mot. at 1.  Defendants
contend that this is a "novel question regarding Georgia law" and there are "no
clearly controlling precedents" which are determinative of the issue.  Id. at 6-9.
Plaintiffs oppose certification of such question because the answer to the question
is not determinative of their constitutional claims and the delay in obtaining an
answer would effectively deny the relief sought.  Pls.' Combined Br. at 14-23.

Federal courts may certify "novel, unsettled questions of state law" to a
state's highest court for resolution.  Arizonans for Off. English v. Ariz., 520 U.S.
43, 79 (1997).  More specifically, this Court may certify questions of state law to
the Supreme Court of Georgia if there are questions of Georgia law "which are
determinative of the case and there are no clear controlling precedents in the
decisions of the [Georgia] Supreme Court."  O.C.G.A. § 15-2-9(a).  The decision

20

whether to certify a question "rests in the sound discretion of the federal court."

Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974).

The United States Court of Appeals for the Eleventh Circuit has opined that a federal court should certify a question of law to a state supreme court "[w]hen substantial doubt exists about the answer to a material state law question upon which the case turns." Looney v. Moore, 861 F.3d 1303, 1314 (11th Cir. 2017) (citation and quotation omitted); see also Peoples Gas Sys. v. Posen Constr., Inc., 931 F.3d 1337, 1340 (11th Cir. 2019) (citation omitted) ("Under this circuit's precedents, we should certify questions to the state supreme court when we have 'substantial doubt' regarding the status of state law."). The Eleventh Circuit acknowledges that it "traditionally has been less reluctant than others to certify questions of state law." Royal Cap. Dev. LLC v. Md. Cas. Co., 659 F.3d 1050, 1055 (11th Cir. 2011).

> When substantial doubt exists about the answer to a material state law question upon which the case turns, a federal court should certify that question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law. See, e.g., Mosher v. Speedstar Div. of AMCA Int'l, Inc., 52 F.3d 913, 916-17 (11th Cir. 1995). "Only through certification can federal courts get definitive answers to unsettled state law questions. Only a state supreme court can provide what we can be assured are 'correct' answers to state law questions, because a state's highest court is the one true and final arbiter of state law." Sultenfuss v. Snow, 35 F.3d 1494, 1504 (11th Cir. 1994) (en banc) (Carnes, J., dissenting), cert. denied, 513 U.S. 1191 (1995).

Forgione v. Dennis Pirtle Agency, Inc., 93 F.3d 758, 761 (11th Cir. 1996).

Still, the Eleventh Circuit cautions that a court should do so with "restraint," Royal Cap. Dev., 659 F.3d at 1055, and notes that "[o]n many occasions this court has resolved difficult or uncertain questions of state law without recourse to certification." Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co., 832 F.3d 1318, 1326 (11th Cir. 2016). It is clear that the "certification of state law questions is a matter of discretion." Royal Cap. Dev., 659 F.3d at 1054-55. And, in applying that discretion, courts consider the following factors: (1) the closeness of the question and the existence of sufficient sources of state law to allow a principled rather than conjectural conclusion; (2) the degree to which considerations of comity are relevant; and (3) the practical limitations of the certification process. Id. at 1055. The first factor is the "most important." Id.

The Court does not find that the determination of when a leadership committee can be operated by the nominee of a political party for Governor is uncertain under Georgia law. "In all interpretations of [Georgia] statutes, the ordinary signification shall be applied to all words[.]" O.C.G.A. § 1-3-1(b); see also Miller v. Ga. Ports Auth., 266 Ga. 586, 587 (1996) (recognizing the cardinal rule of statutory interpretation in Georgia, which is to look to the intention of the legislature and apply the plain meaning to all words, except words of art). The

22

manner in which a political nominee for the office of Governor is selected in Georgia is plain and unambiguous. "A political party shall nominate its candidates for public office in a primary." O.C.G.A. § 21-2-151(a). "Primaries of all political parties shall be conducted jointly" and, for the office of Governor, such primary "shall be held on the Tuesday of the twenty-fourth week prior to the November general election."[4] Id. §§ 21-2-150, 21-2-151(b). Under the plain language of the Georgia Election Code, the Democratic and Republican Parties nominate their candidates for the office of Governor "in a primary" which is held on a date certain. There are no caveats or conditions in state law that would alter that scenario based upon the number of persons who might qualify to run in the primary.

Consistent with the above provision, the LC Statute authorizes the formation of a leadership committee by "the nominee of a political party for Governor selected in a primary election in the year in which he or she is nominated." O.C.G.A. § 21-5-34.2(d) (emphasis added). Until the nominee is selected in the primary election, the statute would not authorize the receipt of contributions by a leadership committee on behalf of a candidate for a political party's nomination for

---

[4] For 2022, the general primary date is Tuesday, May 24, 2022.

23

Governor who happens to face no opposition in the primary. Indeed, the person must be "selected in a primary election." Id.; see also O.C.G.A. § 21-2-151(a).

Consequently, this Court declines to certify to the Supreme Court of Georgia the question of whether a sole qualified candidate for a political party's nominee for Governor may establish a leadership committee pursuant to O.C.G.A. § 21-5-34.2, because it is not an unsettled question of state law. Defendants' motion to certify such a question is **DENIED**.

## IV.   LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction, a plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that granting the relief would not be adverse to the public interest. Scott v. Roberts, 612 F.3d 1279, 1290 (11th Cir. 2010); Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005). A preliminary injunction is an extraordinary remedy which a court should grant only when the movant clearly carries the burden of persuasion as to each of the four prerequisites. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003). The decision whether to grant preliminary injunctive relief is within the broad discretion of the district

court.  Democratic Party of Ga., Inc. v. Crittenden, 347 F. Supp. 3d 1324, 1339

(N.D. Ga. 2018).

"The likelihood of success on the merits is generally considered the most

important of the four factors."  Furman v. Cenlar FSB, No. 1:14-CV-3253-AT,

2015 WL 11622463, at *1 (N.D. Ga. Aug. 26, 2015) (citation and quotation

omitted); see also Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986)

("Ordinarily the first factor is the most important.").  The purpose of a preliminary

injunction is to maintain the status quo until the court can enter a final decision on

the merits of the case.  Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011).

## V.   DISCUSSION

Even assuming that Plaintiffs have standing, the Court finds that Plaintiffs

have failed to show a likelihood of success on the merits so as to support the

granting of their motion for a preliminary injunction.

The First Amendment to the United States Constitution declares that

"Congress shall make no law . . . abridging the freedom of speech." U.S. CONST.

amend. I.  "Speech is an essential mechanism of democracy, for it is the means to

hold officials accountable to the people."  Citizens United v. Fed. Election

Comm'n, 558 U.S. 310, 339 (2010) (citing Buckley v. Valeo, 424 U.S. 1, 14-15

(1976)) ("In a republic where the people are sovereign, the ability of the citizenry

to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."). "[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 223 (1989) (internal punctuation and citation omitted).

"Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association." Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440 (2001); see also Ala. Democratic Conf. v. Broussard, 541 F. App'x 931, 932-33 (11th Cir. 2013) ("It is well-established that political contributions are considered to be political speech, and protected by the First Amendment."). In the context of political speech, the right of association and the right of expression are not analyzed in a vacuum. Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 300 (1981) ("A limit on contributions in this setting need not be analyzed exclusively in terms of the right of association or the right of expression. The two rights overlap and blend; to limit the right of association places an impermissible restraint on the right of expression."). "[T]he right of [political] association is a basic constitutional freedom . . . that is closely

26

allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." <u>Buckley</u>, 424 U.S. at 25 (1976) (internal punctuation and citation omitted).

Nevertheless, the right to receive political contributions is not without the ability of a legislative body to impose some restriction.

> The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute. Our cases have held that Congress may regulate campaign contributions to protect against corruption or the appearance of corruption. At the same time, we have made clear that Congress may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others.

<u>McCutcheon v. Fed. Election Comm'n</u>, 572 U.S. 185, 191 (2014) (citations omitted). "Compared to restrictions on spending, which receive a higher level of scrutiny, 'restrictions on political contributions have been treated as merely 'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." <u>Davis</u>, 554 U.S. at 738 (quoting <u>Fed. Election Comm'n v. Beaumont</u>, 539 US. 146, 161 (2003)). Consequently, "[a] law limiting contributions is valid 'if the State demonstrates a sufficiently important interest' and the law is 'closely drawn' to serve that state interest, even if there is a 'significant interference' with political association." <u>Ala. Democratic Conf. v.</u>

27

Att'y Gen. of Ala., 838 F.3d 1057, 1063 (11th Cir. 2016) (quoting Buckley, 424

U.S. at 25). This standard is a "lesser demand" than strict scrutiny. Id. (citing

Beaumont, 539 U.S. at 155). "The goal of this 'less rigorous standard of review' is

to give the legislature 'sufficient room to anticipate and respond to concerns about

circumvention of regulations designed to protect the integrity of the political

process.'" Id. (quoting McConnell v. Fed. Election Comm'n, 540 U.S. 93, 137

(2003), overruled on other grounds by Citizens United, 558 U.S. 310).

In Perdue v. Kemp, this Court considered whether the plaintiffs in that case

were likely to succeed on their claim that, based on Davis, Georgians First's

expenditures in support of Governor Kemp's re-election during the primary were

violative of the First Amendment:

> O.C.G.A. § 21-5-34.2 effectively negates the contribution limit upon
> which all candidates for Governor in the primary election are bound for
> just one person: Governor Kemp, the incumbent. The new law leaves
> Perdue subject to a maximum contribution limit of $7,600 while
> Governor Kemp can raise unlimited contributions through his
> leadership committee, Georgians First. Therefore, whether this law
> passes constitutional muster depends on whether Defendants can
> demonstrate a sufficiently important state interest and, if so, whether
> the law is closely drawn to serve that interest.

Perdue v. Kemp, 2022 WL 710959, at *10. This Court then found that the state's

proffered interest, "transparency," was "not a sufficient legal justification for the

'unprecedented step of imposing different contribution . . . limits on candidates

28

vying for the same seat[.]'" Id. at *12 (quoting Davis, 554 U.S. at 743).

Additionally, the Court found that there was no indication that the state's interest in enacting the LC Statute was the prevention or appearance of corruption, which is the only recognized state interest sufficiently legitimate to justify any intrusion upon political contributions. Id. Finally, this Court found that even if there was a legitimate government interest, the LC Statute was not closely drawn to serve that interest. Id. That same reasoning is applicable to the facts of this case.

Defendants argue that the reasoning this Court applied in Perdue v. Kemp, preliminarily finding that Perdue was likely to succeed on the merits of his claim that the LC Statute violated his rights under the First Amendment, is not applicable to the facts of this case because Abrams and Governor Kemp are not similarly situated. Defs.' Opp'n at 17-18. Specifically, Defendants contend that Abrams and Governor Kemp "are not currently competing against each other on the ballot with disparate contribution limits in the manner envisioned as impermissible by the Davis court." Id. The Court finds Defendants' argument to be a distinction without a difference. Both Abrams and Governor Kemp are candidates for Governor who are not yet the nominees of their respective political parties. Under the current campaign finance scheme, Governor Kemp, through Georgians First, can accept unlimited campaign contributions, effectively removing Governor

Kemp from the statutory contribution limits imposed by O.C.G.A. § 21-5-41. In contrast, because Abrams is not yet the Democratic Party nominee, she is confined to the campaign contribution limits under O.C.G.A. § 21-5-41 even though she is running for the same office. In other words, they are both candidates for the same office, neither of whom have officially secured their parties' nomination, yet Governor Kemp through his leadership committee can accept contributions in unlimited amounts, while Abrams is not yet permitted to accept contributions through a leadership committee and is subject to the $7,600 limit. As this Court held in Perdue v. Kemp, this campaign finance scheme amounts to an impermissible restraint on speech:

> the Supreme Court has "never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other," and has opined that "the unprecedented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment."

Perdue v. Kemp, 2022 WL 710959, at *9 (quoting Davis, 554 U.S. at 738, 743-44).

Defendants also argue that this Court's Order in Perdue v. Kemp has eliminated any constitutional infirmity in the LC Statute until after the conclusion of the primary election cycle, as the Order restrains Governor Kemp's leadership committee in its activities "against not just former Senator Perdue but against any opponent through the conclusion of the primary election cycle and is further

restrained in advocating for the election of Governor Kemp." Defs.' Opp'n at 18-

19. This Court's Order preliminarily enjoins Governor Kemp's leadership

committee, Georgians First,

> from expending funds beginning on the date of this Order (1) for the
> purpose of advocating for the re-election of Governor Kemp or the
> defeat of an opponent of Governor Kemp through the 2022 primary
> election and 2022 primary runoff election, if any there be, or (2) to
> defray ordinary and necessary expenses incurred in connection with
> Governor Kemp's campaign for re-election as Governor of Georgia
> though the 2022 primary election and 2022 primary runoff election, if
> any there be, until further Order of this Court.
>
> Nothing in this Order shall prevent Georgians First Leadership
> Committee, Inc. from continuing to receive contributions and to make
> expenditures in support of public officials other than Governor Kemp
> in accordance with the requirements of O.C.G.A. § 21-5-34.2.   In
> addition, nothing in this Order shall operate to make unlawful any
> expenditures by Georgians First Leadership Committee, Inc. to
> promote Governor Kemp's re-election or the defeat of an opponent of
> Governor Kemp previously made prior to the date of this Order or
> previously committed to be made by a contract entered into prior to the
> date of this Order even if those expenditures have not yet been
> completed in accordance with such pre-existing contract.

Perdue v. Kemp, 2022 WL 710959, at *15. The Order is silent as to whether

Georgians First is able to solicit and receive contributions for Governor Kemp's

campaign against Abrams prior to the time in which he may become the

Republican Party nominee for Governor. Because this Court's Order does not

specifically preclude Governor Kemp from raising funds in unlimited amounts

while Abrams is subject to the $7,600 limit, this Court's Order in Perdue v. Kemp

does not extend to eliminate the alleged constitutional infirmity that forms the basis of this case.  As did the plaintiffs in <u>Perdue v. Kemp</u>, Plaintiffs in this case are likely to be able to show that the LC Statute as applied is an impermissible infringement of Plaintiffs' First Amendment rights.

However, Plaintiffs have failed to show for purposes of their preliminary injunction motion that they are likely to succeed on the merits because the exclusive remedy they seek is an injunction against the Commission that effectively permits One Georgia to operate a leadership committee in contravention of state law and permits Georgians First to continue to violate the First Amendment.  In other words, Plaintiffs seek an order declaring the LC Statute unconstitutional as applied, but paradoxically at the same time seek injunctive relief that would maintain the LC Statute's constitutionality by allowing One Georgia to violate the state law that requires a nominee to be chosen in a primary.

Granting Plaintiffs' requested relief, which is to preclude the Commission from taking any enforcement action against One Georgia if they raise unlimited contributions before the primary, would require this Court to effectively rewrite the LC Statute to recognize Abrams as the Democratic Party nominee before she has been selected in a primary as required by O.C.G.A. § 21-2-151(a).  The Court is unable to re-write the LC Statute in such a manner.  <u>See</u> <u>Va. v. Am. Booksellers</u>

Ass'n, Inc., 484 U.S. 383, 397 (1988) (holding that courts "will not rewrite a state law to conform it to constitutional requirements").

Given the holding in Perdue v. Kemp, Plaintiffs in this case had two options. One of those options was to follow the framework established in Perdue v. Kemp and seek an injunction to prevent Georgians First from soliciting or receiving contributions unless and until Governor Kemp becomes the Republican Party's nominee for Governor.  Plaintiffs instead chose a second, untenable option: to try to convince the Court to permit them to raise unlimited funds in advance of the primary under a statutory campaign finance scheme they allege is unconstitutional, and prevent an agency of the executive branch from enforcing an unambiguous Georgia law that provides that a nominee for Governor is chosen in a primary. This Court will not rewrite Georgia law to enable One Georgia to stand in the same shoes as a leadership committee that, in Plaintiffs' view, is operating in violation of the First Amendment.

Accordingly, even if Plaintiffs had standing to seek the injunctive relief they request, the Court finds that Plaintiffs have failed to clearly demonstrate that they are likely succeed on the merits so as to permit One Georgia to operate a leadership committee in contravention of state law and under a statutory scheme that is likely unconstitutional as applied.  Consequently, the Court finds that Plaintiffs are not

entitled to their requested preliminary injunction and need not consider the other preliminary injunction factors.  See Tiber Lab'ys, LLC v. Hawthorn Pharms., Inc., 527 F. Supp. 2d 1373, 1378 (N.D. Ga. 2007) (quoting Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994)) ("Because, irrespective of relative or public harms, a movant must establish both a likelihood of success on the merits and irreparable harm . . . the district court may deny a preliminary injunction based on the movant's failure to establish either of these two crucial factors without making additional findings respecting the other factors.").

## VI. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Plaintiffs' Motion for Preliminary Injunction [Doc. 9] and Defendants' Motion for an Order to Certify a Question of Law to the Supreme Court of Georgia [Doc. 33] are **DENIED**.

**IT IS SO ORDERED** this 14th day of April, 2022.

MARK H. COHEN
United States District Judge